**[This opinion has been published in *Ohio Official Reports* at 84 Ohio St.3d 4.]**

OFFICE OF DISCIPLINARY COUNSEL *v.* SUAREZ.

[Cite as *Disciplinary Counsel v. Suarez*, 1998-Ohio-305.]

*Attorneys at law—Misconduct—Public reprimand—Writing two checks from a client trust account to cover a deficit in former law firm's operating account.*

(No. 98-825—Submitted August 19, 1998—Decided November 10, 1998.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 96-90.

————————————

{¶ 1} In a complaint filed October 15, 1996, relator, Office of Disciplinary Counsel, charged respondent, Isabel Suarez of Dayton, Ohio, Attorney Registration No. 0015899, with professional misconduct, including a violation of DR 9-102(A) (failing to preserve identity of client's funds). After hearings on June 6 and August 14, 1997, a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board") found that Suarez had violated DR 9-102(A) by writing two checks from a client trust account to cover a deficit in her former law firm's operating account. The panel recommended that Suarez receive only a public reprimand, after considering the mitigating circumstances surrounding her misconduct, her acknowledged integrity within the practice of law, her lack of any prior professional sanction, and her dedication to the Hispanic community. The board adopted the panel's findings of fact, conclusions of law, and recommendation.

————————————

*Jonathan E. Coughlan*, Disciplinary Counsel, and *Lori J. Brown*, Assistant Disciplinary Counsel, for relator.

*David C. Greer*, for respondent.

_____

***Per Curiam.***

{¶ 2} In November 1994, Suarez joined the law firm of Bruce A. Buren & Associates to serve as a managing/marketing associate with signatory authority on the firm's bank accounts. As part of her employment agreement, Suarez assigned her interest in twelve migrant workers' personal injury cases that were eventually settled and that brought substantial sums under the Buren firm's control. The firm retained thirty-three and one-third percent of these settlements as legal fees, deposited in the firm's client trust account funds sufficient to cover the plaintiffs' medical expenses, and paid to each client the remainder of his or her proportionate settlement share. But rather than draft checks, on the firm's behalf, to the providers of the clients' medical care, Suarez transferred approximately $16,000 to the Buren firm's operating account to cover expenses, knowingly causing the trust account to fall below the clients' medical costs.

{¶ 3} The board found that Suarez had commingled funds in violation of DR 9-102(A), but also that extentuating circumstances mitigated against imposition of an actual suspension period. We agree.

{¶ 4} As the board recognized, Suarez committed her misconduct during a particularly difficult time in her life — she had recently been hospitalized for psychiatric problems, she was newly divorced and embroiled in a losing custody battle, and she had become entangled in a romantic relationship with her employer, Bruce A. Buren. Buren had persuaded Suarez to leave her job as the manager of legal services for the Montgomery County Children Services Board and to join his fledgling law firm, promising her a lucrative international law practice. The firm soon experienced severe financial problems, and Buren ordered Suarez to transfer certain trust account funds to the firm's operating account. She reluctantly complied based on Buren's assurance that the money would be used to pay the clients' medical expenses. Suarez wrote a trust account check to the operating

account in February 1995 and another in March 1995, but despite her repeated pleas and protestations that the transfers were improper, Buren never approved payment to the clients' medical providers.

{¶ 5} Suarez had become increasingly aware of the firm's dire financial state by the time she and Buren ended their relationship in March or April 1995, but she was desperate to remain employed to improve her chances for winning custody of her child. She confessed that she wrote the checks transferring the trust account funds with the understanding that the funds might be used improperly for operating costs. So in an attempt to mitigate the infraction, Suarez ignored Buren's instruction to identify the funding source as some bogus client and instead truthfully disclosed on at least the February check stub that the deposit was to cover an operating account deficiency. Suarez has since frankly accepted responsibility for her part in the commingling scheme, which we attribute to her naivety and vulnerability. Suarez ultimately quit the firm in April 1995 amid her suspicions that Buren was not ever going to authorize payment of the clients' medical expenses, that he had opened a credit card account for her without her knowledge, and that he had embarked on a check-kiting campaign, all to sustain the firm no matter what the cost.

{¶ 6} Suarez is a Cuban immigrant, fluent in Spanish, who came to this country at the age of twelve after experiencing certain traumatic episodes during the Bay of Pigs conflict and Cuban Missile Crisis. In fact, her hospitalization in the summer of 1994 was in part the result of post-traumatic stress syndrome and in part due to deep depression. Suarez graduated from law school in 1981 and, after serving in various capacities that capitalized on her marketing or bilingual skills, she began practicing privately in 1991, primarily in juvenile law.

{¶ 7} Judge Walter Rice of the United States District Court for the Southern District of Ohio and Judge Michael B. Murphy of the Montgomery County Juvenile Court attested to Suarez's valued services in their courtrooms. Judge Rice related

his esteem for Suarez's effective interpreting skills. He also acknowledged that she was one of very few practitioners able to serve the Hispanic community in the Dayton area. Judge Murphy testified that Suarez had been appointed a part-time referee on his court and that he had high regard for her compassionate and thorough work with the people with whom she came in contact. Other witnesses also acclaimed Suarez's competence and integrity in representing underserved segments of the Dayton community.

{¶ 8} We, like the board before us, find that the circumstances in which Suarez violated DR 9-102(A), especially that of acting under pressure from her employer during a period of overwhelming personal misfortune, dispel any need to impose an actual suspension. For these reasons, we adopt the board's findings of fact, conclusions of law, and recommendation. Accordingly, Isabel Suarez is hereby publicly reprimanded for having violated DR 9-102(A). Costs taxed to respondent.

*Judgment accordingly.*

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

_____

**COOK, J., dissenting.**

{¶ 9} I cannot agree with the majority that the mitigation evidence in this case suffices to preclude actual suspension.

{¶ 10} Her interpreting skills aside, respondent used clients' funds to forestall the collapse of the firm where she was employed. This case of commingling is indistinguishable from others where the lawyer acts out of personal financial adversity. Here, respondent benefited from the infraction as evidenced by her testimony that her custody battle could have been adversely affected by a closing of the firm. The benefit to respondent belies the view that respondent's sanction should be lessened because she was just an unwilling participant in the

offending conduct. The imposition of the sanction of a six-month suspension will preserve the principle that commingling of clients' funds by an attorney is a grievous breach of that lawyer's oath.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

––––––––––––––––––